# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. CR13-4033-DEO |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | DEFENDANT'S MOTION TO |
| | ) | SUPPRESS AND INCORPORATED |
| WAYNE PREISTER, | ) | MEMORANDUM OF LAW |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Defendant, Wayne Preister, by and through counsel, moves this Court to suppress evidence and statements connected to the same as obtained in violation of the Fourth Amendment of the United States Constitution.

## BACKGROUND

On April 12, 2013, members of a drug task force contacted Deputy Todd Trobaugh of the Woodbury County Sheriff's Office and requested that the deputy intercept a vehicle owned and operated by the defendant, Wayne Preister. (Ex. A at 1.) The Task Force officers advised Deputy Trobaugh that the vehicle was a 1996 Honda Accord with tinted windows and that the Task Force officers believed Mr. Preister was transporting a weapon and drugs. (*Id.*) They further indicated that Mr. Preister's window tint was illegal and, thus, a basis for a traffic stop. (*Id.*)

Once Deputy Trobaugh noticed the car, he initiated a traffic stop ostensibly due to the window tint. (*Id.*) Based upon seeing the passenger, Mr. Preister's co-defendant, April

1

Salamanca, reach under the vehicle's dashboard, Deputy Trobaugh ordered Mr. Preister and Ms. Salamanca to place their hands on the car's dashboard. (*Id.* at 1-2.) Both occupants complied. (*See id.* at 2.) Deputy Trobaugh then waited until another officer arrived to serve as backup. (*Id.*)

Upon the backup officer's arrival, Deputy Trobaugh had Mr. Preister step out of the vehicle, leaving Ms. Salamanca in the passenger seat. (*Id.*) Following a patdown search that revealed no weapons or contraband, Deputy Trobaugh asked Mr. Preister to come back to the patrol car, which he did. (*Id.*) Deputy Trobaugh and Mr. Preister then had a conversation in the patrol car regarding Mr. Preister's car windows and Deputy Trobaugh informed Mr. Preister that he was writing a citation. (*Id.*)

Subsequently, Deputy Trobaugh asked to search Mr. Preister's vehicle. (*Id.* at 3.) Mr. Preister declined to consent to the search. (*Id.*) In response, Deputy Trobaugh stated that he would not "search the vehicle," but he, "would run [his] narcotics dog around the vehicle." (*Id.*)

Deputy Trobaugh issued Mr. Preister the citation and asked Ms. Salamanca to step out of the vehicle, so he could do a search of the "exterior" of the vehicle. (*Id.*) Deputy Trobaugh then noticed the driver's side door was open and he went to close it "just a little," so the dog would not "jump right in." (*Id.*) Rather than fully close the door, however, Deputy Trobaugh left the door slightly ajar and unlatched. (*See id.*)

Thereafter, Deputy Trobaugh began to lead his dog around the vehicle for a free air sniff. (Ex. B at 26:35.) The dog did not alert to the outside of the vehicle. (*See id.* at 26:35-27:02.) Eventually, the dog reached the door that Deputy Trobaugh left unlatched and the dog began to pry open the driver's side door with his nose. (*Id.* at 27:03-27:05.) Deputy Trobaugh assisted

the dog in opening the door fully.  (*Id.* at 27:06-27:08.)  As a result of the door being opened, the dog jumped into the driver's seat.  (*Id.* at 27:08.)

Deputy Trobaugh let the dog's leash go and proceeded to standby silently while the dog was inside of the vehicle.  (*Id.* at 27:08-27:25.)  After fifteen to twenty seconds of in-vehicle searching, the dog alerted to a spot on the interior of the driver's side of the vehicle.  (*See id.*)

In light of that alert, Deputy Trobaugh advised Mr. Preister and Ms. Salamanca that they were being detained, and placed handcuffs on them.  (Ex. A at 4.)  Deputy Trobaugh then further searched the vehicle and recovered a handgun, a syringe, and marijuana.  (*Id.*)  Deputy Trobaugh arrested Mr. Preister for carrying a concealed weapon, or unlawful conveyance and felon in possession of a firearm.  (*Id.*)  Likewise, he arrested Ms. Salamanca for possession of drug paraphernalia.  (*Id.*)  Deputy Trobaugh remained at the vehicle while the backup officer took Mr. Preister and Ms. Salamanca to the Woodbury County Jail.  (*Id.* at 5.)

Upon arrival at the jail, Mr. Preister and Ms. Salamanca were taken in for questioning where Ms. Salamanca made certain incriminating statements.  Rather than make statements of his own, Mr. Preister asserted his rights to silence and counsel.

Meanwhile, while waiting with the vehicle, Deputy Trobaugh called for the Drug Task Force to assist him.  (Ex. A at 5.)  Task Force officers Willie Garrett and John Howard came to help search the vehicle.  (*Id.*)  After removal of one of the dashboards, several syringes and methamphetamine were recovered.  (*Id.*)

Based upon the outcome of that search and subsequent statements by Ms. Salamanca, Mr. Preister has been charged with Conspiracy to Distribute Methamphetamine, Possession With

Intent to Distribute Methamphetamine, and Possession of a Firearm in Furtherance of a Drug

Trafficking Crime.  (*See doc. 1.*)

**ARGUMENT**

**I.  The Warrantless Search Of Mr. Preister's Vehicle Was Unconstitutional**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the

people to be secure in their persons . . . and effects against unreasonable searches and seizures,

shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const.

amend. IV.  In light of the proscriptions of the Fourth Amendment, law enforcement is required

to obtain a warrant prior to a search and "'searches conducted outside the judicial process,

without prior approval by judge or magistrate, are per se unreasonable under the Fourth

Amendment – subject only to a few specially established and well-delineated exceptions.'"

*United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (quoting *Mincey v. Arizona*, 437 U.S.

385, 390 (1978)).

**A.  The Dog Sniff Was An Unconstitutional Search**

An alert of a drug-sniffing canine to the possible presence of contraband establishes

probable cause to search a motor vehicle as though a warrant had been obtained.  *Illinois v.

Caballes*, 543 U.S. 405, 409 (2005).  Where, however, a dog sniff is conducted from a place

where the officer and canine are not lawfully present, an unconstitutional search occurs.  *Florida

v. Jardines*, 133 S. Ct. 1409, (2013) (holding that conducting dog sniff from porch violated

expectations of privacy).

The recent *Jardines* decision is particularly instructive as to the incident that led to Mr.

Preister's arrest.  In *Jardines*, the Supreme Court addressed the constitutionality of a dog's

4

search of the exterior of a house.  *Id.* at 1413.  Specifically, the officer handling the dog in *Jardines* allowed the dog space to search and, "[a]fter sniffing the base of the front door, the dog sat, which is the trained behavior upon discovering the [contraband's] odor's strongest point."

The Court held that the use of the canine constituted an unconstitutional search pursuant to the Fourth Amendment.  *Id.* at 1417-18.  Of crucial importance in the decision was the fact that the officer was conducting the dog sniff in an area which was constitutionally protected and wherein the officer was not expressly or impliedly permitted to be.  *See id.* at 1415 ("[A]n officer's leave to gather information is sharply circumscribed when he steps off of [public] thoroughfares and enters the Fourth Amendment's protected areas.").

In this instant, the facts are even more compelling than in *Jardines.*  In *Jardines*, there was at least the cogent argument to be raised as to whether an individual and their dog were truly unauthorized to be present on an individual's porch.  *See, e.g., id.* at 1420 (Alito, J. dissenting) (noting that "[t]he law of trespass generally gives members of the public license to use a walkway to approach the front door of a house and to remain there for a brief time").  Here, in contrast, there is absolutely no question that an individual would not be, even implicitly, welcome to climb into an individual's driver seat and begin exploring the areas out of sight of the explorer.  As the dog and his handler were operating in a space wherein they were not permitted to be, the use of the dog was an unconstitutional search under the Fourth Amendment.

Moreover, Mr. Preister contends that, under *Jardines*, the intentional or accidental nature of the dog's entrance is not constitutionally significant.  *See Jardines*, 133 S. Ct. at 1416 (noting reference to past decisions that subjective intent of officer is irrelevant).  *But see United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007) (declining, pre-*Jardines* to find district court erred in

finding trooper did not create opportunity for dog to enter vehicle);[1] *United States v. Lyons*, 957 F.2d 615, 617 (8th Cir. 1992) ("[T]he dog's instinctive actions did not violate the fourth amendment." (internal quotation omitted)). However, the question of whether *Jardines* applies where the canine enters an area accidentally is not presented here for two reasons.

First, in his report, the officer indicates that he closed Mr. Preister's door "so the dog would not just jump right in there" and yet closed it only "to the point there [sic] was not completely latched . . . ." (Ex. A at 3.) Had the officer closed the door entirely, the dog would not have had the opportunity to enter. Nor can the officer proclaim any surprise at the dog's attempt to enter the vehicle given that he himself acknowledged that very concern when he first partially shut the door. Taking a half measure when knowing a full measure is needed does not render the dog's entry accidental.

Second, the video clearly shows that the officer not only failed to stop the dog from prying open the car door, but actually reaches out and assists the dog in fully opening the door. (*See* Ex. B at 27:06-27:08.) Additionally, once the dog entered the vehicle, it remained within for over fifteen seconds before the first sign of alerting. (*Id.* at 27:08-27:25.) Notwithstanding that amount of time elapsing, Deputy Trobaugh does not appear to verbally or physically attempt to remove the dog from interior of the vehicle. (*See id.*) Moreover, Deputy Trobaugh lets go of the dog's leash rather than simply continue to hold him outside the vehicle. Either of the foregoing would itself suffice to remove the question of whether the dog's entry into the vehicle could be termed as an accidental occurrence. Thus, even if the issue of accidental dog entry onto

---

[1]The Eighth Circuit also noted as significant the district court's finding – substantially different from the circumstances here – that the dog would inevitably have alerted to hte vehicle and had, in fact, alerted all over the exterior of the vehicle as well. *See Lyons*, 486 F.3d at

the property was relevant for constitutional purposes, it would provide no haven for the Government.

**B. The Officer Did Not Have Probable Cause To Search Absent The Dog Sniff**

An additional exception to the warrant requirement is "[t]he so-called 'automobile exception'". *United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005). Under the automobile exception, an officer "may conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* Whether probable cause existed is determined in light of the facts available to the searching officer. *See also United States v. Ross*, 456 U.S. 798, 805 (1982) (noting that probable cause that "reasonably aris[es] out of circumstances known to the seizing officer" permits warrantless automobile search). "Where officers work together on an investigation, [the Eighth Circuit] uses the so-called 'collective knowledge' theory to impute knowledge of one officer to other officers to uphold an otherwise invalid search or seizure." *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001). Moreover, "[i]t is axiomatic that probable cause must exist at the time of the search and not merely at some earlier time." *Kennedy*, 427 F.3d at 1141. The probable cause determination from those facts is made in light of the "totality of the circumstances". *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In the instant case, the facts known to the officers were minimal. Deputy Trobaugh's report indicates that his initial suspicion arose from a mere request from other officers that he pull over a vehicle because of suspicions that the vehicle was transporting drugs. The actual bulk of the genesis of Deputy Trobaugh's belief that a search was permissible appears to be the the all-too-familiar list of "suspicious" activities identified in Officer Trobaugh's report fails to

rise to a level justifying an unwarranted search. In his report, prepared after the search had already been conducted, Deputy Trobaugh references several points that will almost inevitably be asserted as themselves generating probable cause.

First, Deputy Trobaugh's report mentions that he saw the passenger making "quick movements like she was hiding something under the dash . . . ." (Ex. A at 1-2.) Next, Deputy Trobaugh references that Ms. Salamanca's subsequent mannerisms made her appear to be under the influence. (*Id.* at 2.) Finally, as Deputy Trobaugh removed his dog from his vehicle to begin the search, Deputy Trobaugh notes that hugging and whispering by Mr. Preister and Ms. Salamanca made it that you could "tell that they were extremely nervous that [his] dog was going to find something."[2] (*Id.* at 3.) This combination of movement by a passenger that terminated with the officer's command, a passenger's appearing under the influence,[3] an incomplete answer to a compound question, and signs of nerves when asked to wait in a patrol

_____

[2]This observation demonstrates a general disparity between Deputy Trobaugh's characterization of events, and reality. Deputy Trobaugh describes Mr. Preister and Ms. Salamanca hugging as showing that they were "extremely nervous". (Ex. A at 3.) In reality, it appears much more as though Mr. Preister is attempting to keep Ms. Salamanca warm once out of the car while the deputy is finishing searching through her coat. The video clearly shows that the allegedly-suspicious hugging stops as soon as the officer returns Ms. Salamanca's coat to her. (*See* Ex. B at 25:45-26:16); *see also* National Weather Service, Preliminary Monthly Climate Data available at http://www.nws.noaa.gov/climate/index.php?wfo=fsd (attached as Exhibit C) (identifying weather on April 15, 2013 in Sioux City, IA as between 29 and 38 degrees Fahrenheit with average wind speed of 15 miles per hour). Insofar as the Court has to rely upon the allegations not clearly visible from the tape, it should do so with extra caution.

[3]Surely, if Ms. Salamanca's appearing to be under the influence was so strong, the Government does not believe her statements made in the ensuing arrest are those of a person of sound enough mind to provide accurate statements to authorities.

car, and hugging while a dog search was conducted – even with the fruits of earlier investigation – is simply not enough to permit a warrantless search.[4]

Because probable cause did not exist independently of the unconstitutional dog search of Mr. Preister's vehicle, the motor vehicle exception does not save the search from being a Fourth Amendment violation.

## II.  All Tangible Evidence And All Statements Derived From The Evidence – Including The Co-Defendant's Proffer Should Be Suppressed

"The exclusionary rule 'reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.'" *United States v. Villa-Gonzalez*, 623 F.3d 526, 534 (8th Cir. 2010) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)) (omission in original). "Additionally, '[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.'" *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)) (brackets in original). A defendant bears the initial burden of proving that evidence was tainted because an illegal search was the but-for cause of that evidence's discovery. *Id.* at 1079.  Once a defendant meets

---

[4]Also noteworthy are the other instances in the traffic stop where behavior that is inherently not suspicious occurs.  For example, Mr. Preister immediately produces his insurance and registration and Mr. Preister immediately complies with the officer's commands to exit the vehicle and proceed to the officer's vehicle.  (Ex. A at 2; *see also id.* (noting Mr. Preister went so far as to pre-warn the officer before reaching for his glove box).  *Contra United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008) (noting non-compliance with directives as further support of probable cause finding); *United States v. Keys*, 245 F.R.D. 413, 418 (E.D. Mo. 2007) (noting refusal to give insurance card to officer as one fact in establishing probable cause).

that burden, the Government bears the "ultimate burden of persuasion to show the evidence is untainted." *Id.* (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

*Wong Sun* stands as the seminal case in determining what evidence must be suppressed following an unconstitutional search. *See generally* 371 U.S. 471. As the Eighth Circuit has summarized:

> In *Wong Sun*, law enforcement officers entered a man's residence without a warrant, in violation of the Fourth Amendment. Once inside, the owner of the residence made an incriminating statement to police – telling the police he knew someone who sold narcotics. Acting on the statement, the police went to the home of the second man and discovered drugs. The Supreme Court held the drugs must be suppressed. The Court reasoned (1) the warrantless entry into the first home was an illegal search, (2) the admission of the owner of the first home as to the identity of the drug dealer was the direct result of the illegal search, and not the result of 'an intervening independent act of a free will,' and (3) the drugs were found as a result of the admission.

*United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010).

The unbroken chain of tainted items and statements stemming from the unconstitutional search of Mr. Preister's vehicle is substantially clearer than the circumstances of *Wong Sun*. In the absence of unconstitutional search, Deputy Trobaugh was without any tangible evidence to use against Mr. Preister. The eventual finding of syringes, marijuana, methamphetamine, and a gun were all impossible but for the search of the vehicle. The quantity of methamphetamine found after the arrival of Task Force officers was likewise only made possible by the improper search.

Additionally, the statements made by Ms. Salamanca at the police station cannot be considered untainted by the improper search. Ms. Salamanca was only able to be arrested as a result of the items found in the car. But for the search that led to those items, it does not appear Deputy Trobaugh would have had reason to detain Ms. Salamanca. Moreover, the threat of

criminal sanctions from the known-discovery of those items would, inevitably, have been a substantial compelling reason for Ms. Salamanca to give any answers to police at the station and to provide even further information in a post-charge proffer.

Because the unconstitutional search of Mr. Preister's vehicle taints the evidence seized therefrom and the subsequent interviews of Ms. Salamanca, the *Wong Sun* doctrine requires that all of the foregoing be suppressed.

## CONCLUSION

Wherefore, Defendant respectfully requests that this Court suppress any and all physical evidence seized at the traffic stop leading to Mr. Preister's arrest and any and all statements that were taken after that illicit seizure.

Respectfully submitted,

FEDERAL DEFENDER'S OFFICE
701 Pierce Street, Suite 400
Sioux City, Iowa 51101-1036
(712) 252-4158 Telephone
(712) 252-4194 Fax
E-mail:Max_Wolson@fd.org
Contact E-Mail:Annette_Torgerson@fd.org

By:__/s/ Max S. Wolson_____
MAX S. WOLSON
ATTORNEY FOR DEFENDANT

Original Filed with Court.
Copies mailed/ECF to:

Jack Lammers
Assistant U.S. Attorney
ATTORNEY FOR PLAINTIFF,
UNITED STATES OF AMERICA

Wayne Preister, DEFENDANT

**CERTIFICATE OF SERVICE**

I served a copy of this document on the attorneys of record of all parties as follows:

1. Method of Service: ( √ ) first class mail
( √ ) Electronic service
(   ) certified mail, return
receipt requested

2. Date served: July 12, 2013

I declare that the statements above are true to the best of my information, knowledge, and belief.

   /s/Annette Torgerson